

SCANNED

U S DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

JAN 1 0 2015

CHRISTA K. BERRY, CLERK
BY_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Magistrate No. 2:15-mj- 10 -JHR |
| | ) | |
| GREGORY OWENS | ) | |

## CRIMINAL COMPLAINT

I, Pamela A. Flick, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

### COUNT ONE
### Interstate Domestic Violence

On about December 18, 2014, in the District of Maine and elsewhere, the defendant

### GREGORY OWENS

did knowingly travel in interstate commerce from New Hampshire to Maine, with the intent to kill or injure his spouse, R.O., and in the course of or as a result of such travel, did commit a crime of violence, that being attempted murder and aggravated assault, against R.O., causing life threatening bodily injury to her.

Thus, the defendant violated Title 18, United States Code, Section 2261(a)(1) and (b)(2).

### COUNT TWO
### Discharge of a Firearm During and in Relation to a Crime of Violence

On about December 18, 2014, in the District of Maine, the defendant

### GREGORY OWENS

knowingly discharged a firearm, that is, a 9mm pistol, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, specifically, the interstate domestic violence charge alleged in Count One of this Complaint.

Thus, the Defendant violated Title 18, United States Code, Section 924(c)(1)(A)(iii).

I further state that I am I am a special agent with the Federal Bureau of Investigation. This Complaint is based on those facts which are set forth in my affidavit which is attached hereto and incorporated by reference.

Pamela A. Flick

Sworn to before me, and subscribed in my presence this _10th_ day of January, 2015.

United States Magistrate Judge

## AFFIDAVIT OF PAMELA A. FLICK

1.      I, Pamela A. Flick, am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Portland, Maine field office, and I swear that the following is true. I make this affidavit in support of the issuance of a criminal complaint charging Gregory Owens with interstate domestic violence, in violation of Title 18, United States Code, Section 2261(a), and discharging a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c).

2.      The information contained in this affidavit is based on my personal involvement in this investigation, my training and experience, and information provided to me by other law enforcement officers. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact I know concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to support the issuance of the requested criminal complaint.

3.      On December 18, 2014, at approximately 2:47a.m., the Saco, Maine Police Department (Saco PD) received a 911 call regarding a home invasion/shooting at the residence of husband and wife, S.C. and C.C. Specifically, S.C. reported that he had just been shot in his home and was hiding in a closet. S.C. reported that there may be other victims in the home. A subsequent investigation by the Saco PD, Maine State Police (MSP), New Hampshire State Police (NHSP), the Bureau of Alcohol, Tobacco & Firearms (ATF) and the FBI has revealed the following facts in support of probable cause to believe that Gregory Owens is the home invader/shooter who traveled from his home in Londonderry, New Hampshire, to the home of S.C. and C.C. with the intent to kill his wife, R.O., who was the couple's overnight guest at the time.

1

## BACKGROUND & MOTIVE

4.       Based on statements provided to investigators by Owens, R.O., and friends and
family close to the couple, I have learned that the Owens's have been married for over 35 years
and share one adult child. According to a Saco PD interview of C.C., the lifelong friend who was
hosting R.O. when the shooting occurred, R.O. became suddenly and inexplicably ill sometime
in 2014, exhibiting symptoms of dementia at the age of 55 despite previously enjoying years of
good health and no known medical problems.

5.       C.C. further reported that in approximately November 2014, Owens began calling
upon friends like her to relieve him of his care for R.O. because R.O. had no short term memory
and was unable to care for herself. According to another close friend of R.O who reached out to
the Saco PD during the investigation, Owens contacted her approximately one month before the
shooting and asked to have R.O. move in with her in Florida, claiming he would follow one
month later. Additionally, Owens himself reported to investigators that R.O.'s doctors suggested
to him that he limit his frequent travel in order to be able to care for his wife.

6.       On December 15, 2014, C.C. traveled to the Owens's Londonderry home and
brought R.O. back to the Saco home she shares with her husband, S.C., for a visit of a few days
in which R.O. planned to do some Christmas shopping, visit her elderly parents who live nearby,
and relieve her overburdened husband. The shooting occurred in the early morning hours of
December 18, 2014, the day C.C. reported she was scheduled to bring R.O. back home to New
Hampshire.

7.       The investigation has also revealed that in approximately 2008, Owens began a
romantic affair with B.W. of Oshkosh, Wisconsin, while still married to, and living with R.O.
Specifically, on December 20, 2014, Saco PD Detective Sergeant Huntress received a message to

2

contact Chief Lemire of the University of Wisconsin at Oshkosh Police Department. When they connected, Chief Lemire advised Huntress that he is a neighbor of B.W., with whom Owens has been in a romantic relationship for the last six years. According to Chief Lemire, he has personally met Owens numerous times when Owens has visited B.W. in Oshkosh, which he says occurs every three to four weeks. B.W. reported to Chief Lemire that the most common way she communicated with Owens was via draft emails on a shared account which Owens would regularly delete after messages were sent back and forth.[1]

8.      Approximately two weeks before the shooting, Chief Lemire advised that B.W. was at his home when she received an apparent inadvertent phone call from Owens wherein she overheard Owens speaking to R.O. about their grandchildren. According to Chief Lemire, the conversation appeared to leave B.W. with the impression that despite promises made to her, Owens had no intention of leaving his wife. Chief Lemire then advised that B.W. threatened to expose and end her relationship with Owens, by publishing photos of the two of them together in the local newspaper to get his attention.

### THE HOME INVASION AND SHOOTING IN SACO

9.      Interviews of S.C. and C.C. by detectives of the Saco PD reveal the following events leading up to the shooting at their residence on December 18, 2014. C.C. woke to the sounds of broken glass downstairs at approximately 2:45 a.m. She woke up S.C. and then immediately ran from the master bedroom across the hall to an empty spare bedroom in which she barricaded herself behind the door. At the time, their guest R.O. was asleep in a second spare bedroom on the same floor. After his wife left, S.C. exited the master bedroom and walked out

---

[1] I was advised by Saco PD Detective Fred Williams, the certified computer forensic examiner who conducted an analysis of Owens computer as part of this investigation, that deleted email drafts are not preserved on web-based email accounts like the one Owens and B.W. shared.

into the hall where he observed a man approximately 5'9" tall with a medium build[2] dressed in dark clothing and a ski mask walking up to the landing at the top of the stairs carrying a handgun.

10.    Upon seeing the intruder, S.C. immediately returned to the master bedroom and attempted to shut and lock that door. The intruder walked immediately to the first spare bedroom in which C.C. was hiding and tried unsuccessfully to kick open the door. The intruder then went immediately to the second spare bedroom door from where he shot at R.O. four times while she slept, striking her body three times including one bullet to the back of her head. The intruder then came to the master bedroom door which was partially ajar and looked inside. At the time, S.C. and the intruder made eye contact and S.C. observed for the first time that the intruder was wearing glasses.[3]

11.    S.C. attempted to shut the door, but the intruder kicked in the door completely removing the door handle and lock. S.C. again closed the now broken door and retreated towards a closet of the bedroom. At this time, the intruder shot S.C. through the closed door, striking him three times, in the arm, shoulder and back. Despite their serious injuries, both R.O. and S.C. survived. C.C. was uninjured. R.O., who was sleeping when shot, remembers very little about the incident.

### THE SCENE EXAMINATION

12.    During an examination of the scene by Saco PD investigators, Detective Sergeant Huntress observed that entry to the residence appeared to have been made through a rear garage

---

[2] Owens is approximately 5'9" tall with a medium build.

[3] Owens always wears glasses according to S.C. and C.C., lifelong friends of R.O., who reported the same to Huntress. Additionally, S.C. recalls that during a joint vacation with the Owens's, Owens wore the very same type of glasses as those worn by the intruder.

door, where the door was kicked open with the glass smashed out.

13.    Additionally, eight 27-year-old 9 mm Western Cartridge Company shell casings (stamped "WCC1987") were located on the second floor of the home where the shootings occurred.

14.    Among other evidence collected for ongoing analysis, an investigator located, and Huntress preserved, foot impressions in the dirt of a flower bed in between two shrubs outside a first floor window which were casted and lifted for analysis at the Maine State Police Crime Laboratory (hereinafter "Crime Lab").

### THE INITIAL ENCOUNTER & VEHICLE EVIDENCE

15.    At 5:52 a.m., NHSP troopers located Owens's vehicle parked at his Londonderry home with a warm engine hood. They then observed Owens leave the residence and drive to the Circle K convenience store just a few miles down the road in Hudson, New Hampshire. At approximately 6:00 a.m., the troopers initiated a traffic stop to notify Owens that his wife had been shot in Saco. In response to the news, according to the troopers on scene, Owens feigned a heart attacked and was treated by the Hudson Fire Department, but refused transport to the hospital. During this encounter, the troopers observed in plain sight what appeared to be a cut on Owens's left hand[4] and blood on the steering wheel and the driver's side armrest section of the door. There was a pair of black gloves sitting on the front passenger seat and a computer and a pair of wet, dark-colored boots on the rear seat. Owens was then asked to voluntarily submit to an interview and testing at the Londonderry Police Department (Londonderry PD) and he agreed.

---

[4] Owens said the cut was caused by a broken coffee mug, but no broken mug was later found at the Owens residence. Owens later told a different investigator, Saco PD Detective Jeffery Cook, that the cut was from a broken glass in the kitchen and that investigators would find broken glass on the kitchen floor and in the trash, which they did. Still, however, no blood was located on or near the glass.

At the time, Owens was wearing a dark blue windbreaker, light green cargo pants and tan boots.

16.     Once at the police station, Owens was provided with *Miranda* warnings and was informed that the interview would audio and video recorded. He signed the *Miranda* waiver form and agreed to speak to the investigators. After his waiver, Owens was informed that his wife had been shot, but was still alive. According to NHSP Trooper Marc Beaudoin, Owens expressed relief but did not ask what happened. When asked by Beaudoin what he had been doing for the last 12 hours or so, Owens offered the following timeline.

### THE INTERVIEW AND ALIBI

17.     Owens explained that he last spoke to his wife by telephone at approximately 9:15 p.m. the night before[5], after which he claimed to work on a computer project until approximately 12:30 a.m., when he then drove to the Circle K for soda and cigarettes[6]. Owens then reported having returned home to again work on the project until approximately 2-2:30 a.m. He then went to bed, jumped up quick to fix a slide on his computer project, and then returned to bed to sleep for the next three hours. At around 5:30 a.m., Owens told Beaudoin that he headed back to the Circle K for coffee where he was stopped by the police. During the interview, Beaudoin observed blood on Owens's left hand.

18.     A short time later, Saco PD Detective Jeffrey Cook arrived at Londonderry PD and interviewed Owens. According to Beaudoin, Owens then changed his timeline. When speaking to Cook, Owens claimed he had slept for only two hours after working on his project

---

[5] This call and its timing was confirmed by Saco PD through interview of R.O., S.C. and C.C.

[6] I have viewed a video of surveillance camera footage from Circle K in Hudson which shows Owens entering the store at approximately 12:11 a.m. At the time, Owens is dressed in dark-colored clothing and boots, similar to that which S.C. described the intruder to be wearing.

until 2:30 a.m. and advised that he had traveled to the Dunkin' Donuts in Londonderry at approximately 4-4:30 a.m. for donuts and coffee[7], which he did not drink, so he needed to return to the Circle K where he encountered the police.

19.     At the conclusion of the interview in Londonderry, Beaudoin informed Owens that he was free to leave but that they had secured his residence and vehicle in order to obtain search warrants.  Owens then expressed for the first time a desire to see his wife, who he had been told was in surgery at Maine Medical Center (MMC) in Portland, Maine. He accepted the NHSP troopers' offer to transport him to MMC. On the way, however, Owens asked the investigators to stop at TJ Maxx in Londonderry to buy a change of clothes, and then at a nearby store for cigarettes.  Owens spent most of the ride sleeping. Once during the drive north, however, Owens again asked to stop to smoke a cigarette. Owens learned of his wife's shooting and surgery at 5:30 a.m., but did not arrive at MMC until 11:45 a.m.

### PHYSICAL EVIDENCE SEIZED FROM THE OWENS VEHICLE & RESIDENCE

20.     Following the traffic stop and interview, the NHSP secured Owens vehicle and home and then obtained state search warrants for each. A search of the vehicle pursuant to a search warrant and subsequent testing by the Crime Lab revealed that the blood on the steering wheel and armrest was Owens's blood.  Likewise, the wet pair of black Size 11 boots seized from the backseat were later examined by the Crime Lab and compared to the lifts created from the preserved foot impressions found at the victim home in Saco. According to Kimberly James, Senior Lab Scientist at the Crime Lab, the foot impressions left in the flower bed are the same

---

[7] I have viewed a video of surveillance camera footage from Dunkin' Donuts in Londonderry which shows Owens entering the store at approximately 4:50 a.m. At the time, Owens is dressed in the same dark-colored clothing and boots as that depicted on the Circle K video and described by S.C. as being worn by the intruder.

exact size and tread of the wet black boots seized from Owens's car.

21.     During the search warrant execution at the Owens residence conducted the same day, approximately 15 rounds of the same exact 27 year-old 9mm ammunition (stamped "WCC1987") was located in a mug on an office desk and approximately 30 more such rounds were found in a gun safe. Approximately 26 firearms[8] were also located and seized from Owens's residence, including two 9mm handguns which have been sent to the Crime Lab for analysis and an Olympic Arms, Model P.C.R. 02, multi-caliber short-barreled rifle with a barrel length of approximately 9 inches[9] in the den on the second floor of the residence. A black jacket was wet in Owens's washing machine and dark green cargo pants and a black shirt were in the dryer. These clothes match S.C.'s description of the dark-colored clothing worn by the intruder and they resemble the clothing I saw Owens to be wearing in the Circle K and Dunkin' Donuts videos.

## THE FORENSIC COMPUTER EVIDENCE

22.     The Owens home computer in Londonderry was also seized pursuant to the state search warrant. A forensic analysis of that computer by Saco PD Detective Fred Williams revealed that at approximately 10:05 a.m. on December 17, 2014, the day before the shooting, someone searched Google to determine how to change the clock on a computer for purposes of hiding the actual time of its use. Williams also determined that over the course of the next seven hours, the clock on the computer was changed three times for a total of three hours' difference.

---

[8] According to Owens's military records obtained by Saco PD, which I reviewed, Owens is a retired U.S. Army E-9 Sergeant Major and was trained as an expert marksmen.

[9] Under Title 26 of the United States Code, a firearm with a rifle barrel of less than 18 inches must be registered with the National Firearms Registration and Transfer Record (NFRTR) to be legally possessed. The short-barreled rifle was seized from Owens's residence to be sent to the ATF Laboratory for analysis, but a formal search of the NFRTR has yet to be conducted.

23.     According to Williams, from approximately 5:16 to 5:19 a.m., Owen's work email and work-related projects were accessed; however, because of the changed time stamp (see ¶ 21 above), it appeared that the computer was used three hours earlier, from 2:16 a.m. to 2:19 a.m. At 5:24 a.m., the Owens computer was set ahead three hours to its original time.

### TIMING & OPPORTUNITY

24.     Based on my review of surveillance camera video footage from the Circle K convenience store in Hudson, New Hampshire, Owens can be seen entering the store at approximately 12:11 a.m. According to a search of Google Maps, traveling at the speed limit, it takes approximately 90 minutes to travel the 93 miles from Circle K in Hudson the victim home in Saco. The 911 call was received at 2:47 a.m. According to another search of Google Maps, traveling at the speed limit, it takes approximately 89 minutes to travel the 90 miles from the victim home in Saco to the Londonderry Dunkin' Donuts. Based on my review of surveillance camera video footage from that Dunkin' Donuts, Owens can be seen entering the store at approximately 4:50 a.m.

25.     According to these travel times between the relevant locations, it is possible for Owens to have been at Circle K in Hudson at 12:11 a.m., at the victim home in Saco at 2:47 a.m. and back to Dunkin' Donuts in Londonderry by 4:50 a.m.

### POST-INTERROGATION CONDUCT

26.     Following all searching and testing of Owens's vehicle, Saco PD had it towed back to the police station where it was released to Owens personally by Huntress on December 23, 2014. At the time, Owens asked Huntress absolutely no questions about the progress of the investigation.

27.     On January 1, 2015, Detective Williams was contacted by email by Owens now

9

former employer, C.L, of Target Acquired Technologies in Melbourne, Florida. A follow-up interview of C.L. by Williams revealed that earlier that same day, Owen had called C.L. and asked him to tell investigators that Owens was engaged with him and other colleagues on a work-related Skype call at the approximate time of the shooting. According to C.L., no such Skype took place.

28.     According to witnesses in Wisconsin who socialize with Owens and B.W. as a couple, Owens traveled to Oshkosh to visit B.W. and celebrate the New Year holiday together. According to witnesses in Oshkosh, Wisconsin who reported siting to Chief Lemire, however, over the New Year holiday Owens left R.O. and traveled to visit B.W. and celebrate the holiday with her. According to Chief Lemire, while there, Owens rented a limousine and proffered to B.W. and her family, when questioned about his status as a suspect in the shooting of his wife, that he had been "cleared" as a "person of interest" in the investigation based on a letter he presented to them which allegedly reflected that he was in Afghanistan at the time of the crime.

## CONCLUSION

Based on the above, I have probable cause to believe that Gregory Owens has committed the crimes of interstate domestic violence, in violation of Title 18, United States Code, Section 2261(a), and discharging a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c).

Date:

1/10/15

Pamela A. Flick
Special Agent
Federal Bureau of Investigation

10

Sworn to before me and subscribed in my presence this _10th_ day of January, 2015.

_____
United States Magistrate Judge

11